**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **VICTOR OWENS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 22 C 2801** |
| ) | |
| **THE DUFRESNE SPENCER GROUP** ) | |
| **LLC D/B/A ASHLEY FURNITURE** ) | |
| **HOMESTORE,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Victor Owens has sued his former employer the Dufresne Spencer Group LLC (DSG) for violations of the Fair Labor Standards Act (FLSA) (Count 1); the Illinois Minimum Wage Law (IMWL) (Count 2); the Family and Medical Leave Act (FMLA) (Counts 3 and 4); the Illinois Equal Pay Act (IEPA) (Count 5); and the Illinois Wage Payment and Collection Act (IWPCA) (Count 6). DSG has moved for summary judgment on all of Owens's claims. For the reasons stated below, the Court grants the defendant's motion in part and denies it in part.

**Background**

The following facts are undisputed unless otherwise noted.

**A.     Owens's employment**

DSG is a family-owned business that operates Ashley Homestore furniture stores across the country. DSG operates a distribution center (DC) in Romeoville, Illinois.

DSG distribution centers "function as logistics hubs for the company."  Def.'s L.R. 56.1 Stmt. ¶ 9.  DC employees are tasked with receiving, assembling, and delivering new furniture as well as processing furniture exchanges and repairs.  The Romeoville DC houses six departments: (1) prep/assembly; (2) shop/returns; (3) deliveries; (4) hub and spoke; (5) inventory control; and (6) receiving.

DSG hired Victor Owens, an African American man, on December 17, 2019 to work as a DC supervisor in the prep/assembly department at DSG's Romeoville location.  As a DC supervisor, Owens "was responsible for overseeing the employees and temporary workers within his assigned department," and his duties included "directing the work of those he supervised, issuing corrective actions, and hiring and/or firing employees as needed."  Def.'s L.R. 56.1 Stmt. ¶ 14.  DC supervisors are generally scheduled to work nine hours per day and about fifty hours per week.

At the time DSG hired Owens, he had previously worked at DSG as a lift operator but "had no experience managing a logistics department, and no prior full-time experience in the logistics field in general."  Pl.'s Resp to Def.'s L.R. 56.1 Stmt. ¶ 11. Brian Bachman, who served as the operations manager at the DSG Romeoville location, oversaw the hiring process for Owens's position.  Bachman had the authority to offer Owens a salary ranging from $45,000 to $50,000 per year.  Bachman offered Owens a $48,000 salary.  In November 2021, DSG issued salary raises to nine Romeoville DC supervisors, including Owens, whose salary was raised to $51,360, a 7% increase.  Prior to beginning FMLA leave, Owens "was working approximately 60, sometimes 70, hours per workweek."  Pl.'s L.R. 56.1 Stmt. ¶ 2.

**B.** **Owens's FMLA leave**

DSG's FMLA policies are outlined in the company's employee policy handbook. The handbook provides that employees on leave are subject to DSG's general leave policies and that FMLA coverage may be delayed or denied for failure to give proper notice.  Def.'s L.R. 56.1 Stmt., Ex. SJ-F at DSG 000182-84.  A full-time DSG employee earns paid time off (PTO) on a monthly basis.  New employees receive eighty PTO hours per year and earn 6.67 hours of PTO per month.  DSG also allows employees to use unearned PTO in advance.

In March 2021, Owens requested FMLA leave for treatment of Leiden Factor V, a blood clotting condition.  On March 19, 2021, Owens's doctor, Shah Sejal, M.D., submitted Owens's FMLA certification documents.  Dr. Sejal stated that Owens suffered from a life-long, chronic condition that would require planned medical treatments "1-4 times [per] month."  Def.'s L.R. 56.1 Stmt., Ex. SJ-Z.  Dr. Sejal further stated that it would be medically necessary for Owens to be absent from work on an intermittent basis and work a reduced schedule of five days/forty hours per week due to his condition.  DSG approved Owens's use of intermittent FMLA leave on March 24, 2021. Angela Mimes, a DSG benefits and leave administrator, informed Owens that because his leave would be taken on an intermittent basis, he would be required to comply with the company's attendance policy and adhere to the notice procedures included in the company handbook.  Def.'s L.R. 56.1 Stmt., Ex. SJ-AA.

DSG "employed a 40-hour workweek in calculating [Owens's] FMLA eligibility." Def.'s L.R. 56.1 Stmt. ¶ 40.  For each full workday for which Owens exercised FMLA leave, DSG deducted eight hours from his available FMLA leave.  By January 2022,

3

Owens had used 480 hours of FMLA leave. DSG leave administrator Stephanie
Skinner communicated to Owens that he had exhausted his FMLA leave benefits for the
year and that "he would replenish FMLA time on the dates he took FMLA the prior year
on a rolling basis (e.g. he first used FMLA leave on March 26, 2021, so his first
replenishment would be on March 26, 2022)." *Id.* ¶ 42. After learning that DSG would
no longer approve his FMLA leave requests, Owens began to use PTO to cover his
medical-related work absences. From January to March 2022, Owens used ninety-two
hours of PTO.

In early March 2022 Owens was given a new work schedule that required him to
work nine hours per day, six days per week. Owens e-mailed Bachman and Skinner
stating that per his FMLA certification, he could only work up to five days and forty hours
per week. Bachman replied that he would reach out to Skinner to confirm Owens's
FMLA accommodations. Skinner responded that Owens did not qualify for FMLA leave
at the time.

**C.     Owens's termination**

In preparation for a visit from DSG's executive leadership team, DC Director Jack
Freeman, DC Senior Manager Jason Meil, and Bachman developed a list of tasks for
each department at the Romeoville DC. On March 31, 2022, Freeman e-mailed the list
to all DC supervisors. On April 1, 2022, Owens attempted to use FMLA leave. Skinner
informed Owens by e-mail that he needed to recertify his FMLA paperwork and that his
request would be in "pending status" until DSG received the proper documentation.
Pl.'s L.R. 56.1 Stmt., Ex. 10 at DSG000133. Owens responded to Skinner's message
stating that he needed to use FMLA leave that day. Skinner replied that his FMLA

request was not yet approved.  Skinner also e-mailed Bachman to inform him that while she was processing Owens's FMLA leave request, Bachman should not approve any PTO requests from Owens.  Later that day, Owens left work before the end of his scheduled shift.  That same day, Bachman met with the DC supervisors to discuss the upcoming DSG executive visit.  Due to his absence, Owens did not attend the meeting.

On April 2, 2022, Owens reported to work and left the premises before the end of his scheduled shift.  Owens contends that he "left work early that Saturday in order to be in compliance with his medically necessary FMLA reduced leave schedule."  Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶ 20.  DSG asserts that Owens violated DSG's Code of Conduct and "flout[ed] DSG's policy that supervisors remain at work until their subordinates finish work."  Def.'s L.R. 56.1 Stmt. ¶ 20.

On April 5, 2022, Bachman and Freeman e-mailed Skinner to ask if Owens's FMLA leave for April 1 had been approved.  Skinner responded that "whether that day counts as FMLA remains in pending status until all appropriate documentation is received, reviewed and approved."  Pl.'s L.R. 56.1 Stmt., Ex. 19 at DSG 000131.  Skinner also stated that because Owens had no PTO available, if his FMLA request was denied then he would be held to DSG's regular attendance policy.  Later that day, Freeman e-mailed Bachman, Meil, and Jeanette Miller, a DSG human resources generalist, to ask Bachman and Meil to investigate why Owens left work early.  Miller responded, "[i]f Victor did indeed leave early and not provide a good enough reason as to why he would not have alerted management, please draft a corrective and send it over for review."  *Id.*, Ex. 20.

On April 7, 2022, Bachman and Meil met with Owens and presented him with a

5

written disciplinary corrective action.  The corrective action form stated:

> On 04/02/2022, you left your scheduled work shift 5 hours early without management authorization as well as abandoned your staff that was still working on their assigned project.  This is a direct violation of company code of conduct; Less than acceptable performance, productivity, attendance, punctuality, or attentiveness to the job and failure to follow instructions or established operating procedures, insubordination, or the general disregard for authority.

*Id.*, Ex. 21.  Owens refused to sign the corrective action form.  After the meeting, Meil sent a summary of the meeting to Miller.  In his e-mail, Meil stated that during the meeting, Owens "stated he wished to resign from his position" and communicated his intent to return his work laptop to HR.  *Id.* ¶ 22.  Meil further stated that after the meeting, Owens went to Meil's office and said that he "no longer wanted to be a supervisor" and that he "would rather step down and not quit."  *Id.*  Meil and Bachman assert that due to Owens's statements, they believed that Owens resigned from his position as DC supervisor at the April 7 meeting.  *Id.* ¶ 23.  Owens disputes Meil and Bachman's versions of these events.  According to Owens, when he received the corrective action form, he felt that Meil and Bachman "were trying to fire him."  Pl.'s L.R. 56.1 Stmt. ¶ 21.  Owens further states that at the April 7 meeting, he informed Meil and Bachman "that he would eventually be putting in his two weeks' notice because of how he was being treated."  *Id.* ¶ 23.  Owens says that he did not resign on April 7, 2022.  *Id.*

Following his conversation with Bachman and Meil, Owens sent Miller, Meil, and Bachman an e-mail stating that he would be "leaving for the day."  Def.'s L.R. 56.1 Stmt., Ex. SJ-R.  Meil later called Miller to inform her that Owens had not returned his work laptop.  Miller told Meil that she had received an e-mail from Owens indicating "that he would eventually be putting in his 2 weeks' notice."  Def.'s L.R. 56.1 Stmt. ¶ 26.

Meil and Bachman each called Owens and left him a voicemail message asking him to return their calls.

The next day, Owens e-mailed Meil stating that he would not be able to work his scheduled shift that day due to illness. Meil, Bachman, and Miller each called Owens and left a voicemail message. Owens did not respond to these messages or return their calls. The following day, Owens e-mailed Meil stating that he remained ill and was unable to return to work. Owens also stated that his phone was broken due to a shattered screen. Meil responded to Owens's e-mail stating that DSG had attempted to call Owens multiple times and asking Owens to call his (Meil's) personal cellphone. Def.'s L.R. 56.1 Stmt., Ex. SJ-V. On April 12, 2022, Owens sent an e-mail to Meil and Miller stating that he was "currently in the hospital and won't be in today." Def.'s L.R. 56.1 Stmt., Ex. SJ-W. Meil sent Miller an e-mail stating that he had received a text message from Owens stating that he had a blood clot in his lung, could not speak because he was connected to a breathing machine, and was told by the doctor that he should be able to return to work later that week. *Id.* Meil responded to Owens's e-mail communicating his understanding that Owens had resigned from his position at DSG at the April 7, 2022, meeting. Meil also asked Owens to arrange for the return of his work laptop by April 15, 2022. Owens returned his work laptop to DSG a few days after receiving Meil's e-mail. Owens filed the present lawsuit on May 27, 2022.

**Discussion**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the

7

evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must review the record and draw all reasonable inferences from it in the light most favorable to the non-movant. *Id.* at 255. To withstand summary judgment, the nonmoving party "must do more than simply 'show that there is some metaphysical doubt as to the material facts.'"
*Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty.*, 424 F.3d 659, 667 (7th Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

1. **FLSA and IMWL claims**

The FLSA provides that an employee who works more than forty hours in one workweek must be paid "at a rate not less than one and one-half times the regular rate at which he is employed" for the additional hours. 29 U.S.C. § 207(a)(1). It is undisputed that "[p]rior to beginning FMLA [leave], Mr. Owens was working approximately 60, sometimes 70, hours per workweek." Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 2. This overtime compensation rule does not apply to certain classes of employees, including those employed in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). DSG argues that the FLSA overtime pay requirements do not apply to Owens because he was employed in a bona fide executive capacity.

The burden is on the employer to establish that an employee is exempt from the FLSA's overtime provisions. *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 370 (7th Cir. 2005). An exempt executive employee is one who (1) is compensated on a salary basis at a rate of at least $684 per week; (2) has the primary duty of management; (3) regularly directs the work of two or more employees; and (4) has

hiring or firing authority or provides recommendations on personnel matters that are given "particular weight." 29 C.F.R. § 541.100(a). Owens concedes that he regularly "supervised anywhere from 5-10" employees, Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶ 14, but disputes that he meets the remaining three requirements. Because the IMWL expressly incorporates the FLSA's overtime exemption regulations, the Court considers both claims together. *See* 820 ILCS 105/4a(2)(E); *Kennedy*, 410 F.3d at 376 ("Since the plaintiffs' FLSA claims fail, their related state law claims under the IMWL must fail as well.").

Determination of whether an employee was paid on a salary basis turns on whether he regularly received predetermined wages that were not subject to reductions due to variations in the quality or quantity of his work. 29 C.F.R. § 541.602(a). DSG paid Owens a predetermined rate every two weeks regardless of the number of hours he worked.[1] A salaried employee loses exempt status if the employer has an "actual practice of making improper deductions" from the employee's salary that "demonstrate[s] that the employer did not intend to pay employees on a salary basis." 29 C.F.R. § 541.603(a). Owens argues that DSG made improper deductions from his paycheck for the pay period beginning on October 23, 2021 and ending on November 5, 2021. During this pay period Owens was compensated for sixty-four hours of work. Owens concedes that an eight hour-deduction for FMLA use is warranted for this pay period, but he contends that DSG has failed to account for the additional eight-hour

---

[1] Owens asserts that "[a]t some point DSG transitioned the DC Supervisors to hourly positions." Pl.'s L.R. 56.1 Stmt. ¶ 33. But DSG contends that this transition happened after Owens's employment at DSG, Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 33, and Owens adduces no evidence that he was ever paid on an hourly basis while employed at DSG.

deduction.

When an exempt employee takes unpaid leave under the FMLA, an employer may make deductions from the employee's salary for any hours of unpaid leave within a workweek without destroying the employee's exempt status. 29 C.F.R. § 825.206(a). DSG asserts that Owens used FMLA leave on October 22, 2021 and November 5, 2021 and that deductions for both of these instances of FMLA leave were properly reflected on his paycheck for the pay period ending on November 5, 2021. Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 36. In support of this assertion, however, DSG cites to Owens's timecard for the period from January 3, 2022 to March 18, 2022, which contains no information about Owens's FMLA leave use during the pay period at issue. *See Id.*; Def.'s Resp. to Pl.'s L.R. 56.1 Stmt., Ex. SJ-EE. DSG also cites to a declaration submitted by DSG Human Resources director Haley Emerson, who stated that Owens "utilized full days of FMLA leave on October 15, October 22, and November 5," 2021. Def.'s Resp. to Pl.'s L.R. 56.1 Stmt., Ex. SJ-LL at 1. But in an earlier declaration, Emerson stated that Owens used FMLA leave on only three days in November 2021: November 12, November 19 and November 26. *Id.*, Ex. SJ-C ¶ 21. Miller and Skinner also submitted declarations that listed each day that Owens took a full day of FMLA leave while employed at DSG, and neither declaration includes November 5, 2021. *See* Def.'s L.R. 56.1 Stmt., Ex. SJ-D ¶ 29; *Id.*, Ex. SJ-E ¶ 12. DSG does not explain the conflicting information included in these declarations. Additionally, DSG developed a chart that it asserts shows the total number of hours of FMLA leave Owens took, and November 5, 2021 does not appear on that chart. *Id.*, Ex. SJ-BB (listing all dates that Owens exercised FMLA leave).

That said, "the number of improper deductions" is a relevant factor in determining if an employer has an "actual practice" of making improper deductions. 29 C.F.R. § 541.603. And "[i]dentifying a few random, isolated, and negligible deductions is not enough to show an actual practice or policy of treating as hourly the theoretically salaried." *Kennedy*, 410 F.3d at 372; *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1196 (10th Cir. 2015) ("[plaintiff]'s failure to identify more than the April 3, 2012, deduction precluded a finding of an 'actual practice,' . . . by the [defendant] of making improper salary deductions."); *Cash v. Cycle Craft Co.*, 508 F.3d 680, 684 (1st Cir. 2007) ("We conclude that two aberrant paychecks out of the approximately 50 that [plaintiff] received do not amount to an 'actual practice.'"). Owens has identified just one potentially improper deduction among the approximately fifty paychecks that he received as a DSG employee. This is insufficient to permit a reasonable factfinder to find that DSG had an actual practice of making improper deductions from Owens's paycheck. *See Mathews v. Bronger Masonry, Inc.*, 772 F. Supp. 2d 1004, 1012-13 (S.D. Ind. 2011) (concluding that FLSA exemption applied to employee despite single incident of improper paycheck deduction).

Owens asserts that "the reality of his job duties indicated that he was not truly working in a managerial capacity." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14. But "an employee's performance of nonexempt work does not preclude the exemption if the employer's primary duty remains management." *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 105 (N.D. Ill. 2013). Owens admits that as a DSG supervisor, his "primary duty was managing his department." Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶ 14. Owens also testified during his deposition that his "primary duty" in this role was "supervising

[his] direct reports," Owens Dep. 169:23-170:3, and he described duties that the FLSA implementing regulations define as managerial, such as "directing the work of employees" and "apportioning the work among the employees." 29 C.F.R. § 541.102; *see* Owens Dep. at 170:10-14, 178:17-179:3. Owens's managerial role was thus primary to the non-managerial work he performed. Owens also argues that he was not an executive employee because he performed manual labor. But under the applicable regulation, the performance of manual work is relevant to the question of whether an employee worked in an *administrative* capacity, not an executive capacity. *See* 29 C.F.R. § 541.200(a)(2).

Owens contends that he did not have authority over personnel decisions because DSG supervisors did not have final decision-making power in the hiring process. Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14. But Owens can be considered an executive employee as long as his employer afforded "particular weight" to his recommendations, and "recommendations may still be deemed to have 'particular weight' . . . even if the employee does not have authority to make the ultimate decision." 29 C.F.R. § 541.105. Owens concedes that he was responsible for interviewing candidates, and that his job duties included making recommendations for hiring and termination. Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶ 14. DSG does not address whether particular weight was given to Owens's recommendations. Def.'s Reply at 5-6. But hiring authority is just one factor courts consider in the executive employee analysis, and the remaining factors strongly support DSG's argument that Owens was an exempt executive employee. *See Millikan v. Town of Ingalls*, No. 21-1859, 2022 WL 3928516, at *2 (7th Cir. Aug. 31, 2022) ("[T]o the extent this factor could be said to support

12

[plaintiff]'s argument, it does not overpower the stronger evidence that he was a manager.").

In sum, Owens was paid a salary greater than $684 per week, gave recommendations on hiring and firing decisions, and his primary duty was management. No reasonable jury could find that Owens was not properly classified as an exempt executive employee. Accordingly, DSG is entitled to summary judgement on Owens's FLSA and IMWL claims.

## 2.    FMLA interference

The FMLA allows eligible employees with serious health conditions to take twelve workweeks of leave during each twelve-month period. *Goelzer v. Sheboygan County*, 604 F.3d 987, 992 (7th Cir. 2010). It is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" an FMLA right. 29 U.S.C. § 2615(a)(1). To establish an FMLA interference claim, an employee must show that 1) he was eligible for the FMLA's protections; 2) his employer was covered by the FMLA; 3) he was entitled to take leave under the FMLA; 4) he provided sufficient notice of his intent to take leave; and 5) his employer denied him FMLA benefits to which he was entitled. *Goelzer,* 604 F.3d at 993. To obtain relief under the FMLA, a plaintiff must demonstrate that he suffered prejudice, meaning "harm resulting from the violation." *Ziccarelli v. Dart*, 35 F.4th 1079, 1084 (7th Cir 2022.).

The parties agree that Owens was eligible for FMLA leave, that he provided sufficient notice of his intent to use FMLA leave,[2] and that DSG was covered by the

---

[2] DSG argues in its motion for summary judgment that Owens had not provided sufficient notice of his intent to exercise FMLA leave "after exhausting his replenished FMLA time on April 1, 2022." Def.'s Mot. for Summ. J. at 12. But Owens contends that

FMLA.  DSG argues that Owens cannot demonstrate FMLA interference because he exhausted all of his allotted FMLA leave.  The Court finds that there are genuine issues of material fact regarding whether DSG interfered with Owens's FMLA leave.

### A.    FMLA leave entitlement

The FMLA provides that an eligible employee may take up to twelve workweeks of leave.  Under the FMLA an employee is authorized to use leave on an "intermittent" or "reduced leave schedule" basis rather than taking leave in one continuous block.  29 C.F.R. § 825.205.  FMLA regulations provide guidance for an employer to calculate an employee's leave entitlement when the number of hours that an employee works per week varies.  Specifically, the regulations state that:

> If an employee's schedule varies from week to week to such an extent that an employer is unable to determine with any certainty how many hours the employee would otherwise have worked (but for the taking of FMLA leave), a weekly average of the hours scheduled over the 12 months prior to the beginning of the leave period (including any hours for which the employee took leave of any type) would be used for calculating the employee's leave entitlement.

29 C.F.R. § 825.205(b)(3).  It is undisputed that prior to the beginning of Owens's leave period, the number of hours he worked per week varied but that he regularly worked "approximately 60, sometimes 70, hours per workweek."  Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 2.  But rather than use a weekly average of the hours Owens worked for the twelve months prior to Owens's FMLA leave, DSG calculated Owens's available FMLA leave time by multiplying the twelve-workweek allowance provided by the statute by a

---

DSG interfered with his FMLA rights by asserting that he had exhausted his FMLA leave allotment starting in January 2022.  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 2.  It is undisputed that Owens notified DSG of his desire to utilize FMLA leave between January and April 2022.

standard forty-hour workweek.  Based on this calculation, DSG assumed that Owens was entitled to 480 hours of FMLA leave and told him that he had exhausted his FMLA benefits once he reached this 480-hour threshold.

DSG provides multiple justifications for its use of a forty-hour workweek to calculate Owens's FMLA leave entitlement, but none of these justifications carry the day on summary judgment.  First, DSG points to Owens's FMLA certification documents, which include a note from his doctor indicating that it was medically necessary for him to reduce the number of hours he worked per week due to his health condition.  DSG relies on *Stoops v. One Call Communications, Inc.*, 141 F.3d 309 (7th Cir. 1998), to support its argument that Owens "was only certified for up to 480 hours of leave regardless of his schedule" because of his doctor's FMLA certification.  Def.'s Reply at 2.  DSG's reliance on this case is misplaced.  In *Stoops*, the defendant denied the plaintiff's request for FMLA leave because his doctor's certification stated that he was not incapacitated due to a serious health condition and did not need a reduced work schedule.  *Stoops*, 141 F.3d at 311.   The Seventh Circuit concluded that the defendant was entitled to rely on the doctor's so-called "negative certification" in determining that the employee did not qualify for FMLA leave.  *Id.* at 313-14.

This Court understands DSG's argument as asserting that under *Stoops*, an employer may rely on a doctor's certification to calculate an employee's leave entitlement.  But it is the responsibility of the employer, not the doctor, to determine the applicability of the FMLA to an employee's leave request.  *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 766 (7th Cir. 2008).  And because the defendant had denied the plaintiff's FMLA leave request, the total amount of the plaintiff's FMLA leave entitlement

15

was not at issue in *Stoops*. The *Stoops* court's "negative certification" discussion is therefore immaterial on the question of how to calculate the number of hours of leave that an employee is entitled to under the FMLA. And DSG cites no other legal authority to support the proposition that an employee's certification submitted by a doctor, rather than the employee's existing work schedule as set by the employer, establishes an employee's workweek for the purpose of calculating FMLA leave entitlement.

Second, DSG asserts that it properly calculated Owens's leave entitlement "based on his post-accommodation workweek." Def.'s Reply at 3. Owens's doctor stated that it was medically necessary for Owens to work only "5 days/40 hrs per week." Def.'s L.R. 56.1 Stmt., Ex. SJ-Z at DSG 000153. Again, DSG fails to provide legal support for its argument that an employee's reduced work schedule after the leave period begins, rather than the employee's work schedule prior to the leave period, serves as the basis for calculating the total amount of leave that an employee is entitled to under the FMLA. DSG cites to *Obester v. Lucas Associates, Inc.*, No. 1:08-CV-03491-MHS, 2010 WL 8292401 (N.D. Ga. Aug. 2, 2010), but in addition to being nonbinding authority, that case lends support to ruling in *Owens's* favor. In *Obester*, a plaintiff who regularly worked a forty-hour workweek was put on a reduced work schedule of thirty hours per week due to difficulties associated with her pregnancy. *Id.* at *3. The court stated that because the additional ten hours that the plaintiff would have worked if not for the reduced schedule counted towards FMLA leave, "for each week she worked the reduced schedule, 1/4 (one-fourth) of a week applies to her FMLA leave." *Id.* at 58. In other words, the court used the plaintiff's original forty-hour workweek schedule, not the thirty-hour reduced work schedule, to calculate the amount

16

of FMLA leave used as well as the amount of leave remaining for the plaintiff. *Obester* therefore does not support DSG's post-accommodation calculation argument.

Furthermore, the FMLA regulations provide that the basis of an employee's leave entitlement is "[t]he actual workweek" and that the entitlement therefore should be calculated based on the amount of time that the employee "would otherwise work" if not on leave. 29 C.F.R. § 825.205(b)(1). And the Department of Labor stated in a recent opinion letter that if an employee "would normally be required to work more than eight hours a day but is unable to do so because of an FMLA-qualifying reason," only "the hours which the employee would *have otherwise been required to work* are counted against the employee's FMLA leave entitlement." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FMLA-2023-1-1 (Feb. 9, 2023) (emphasis added). The sixty-to-seventy-hour workweek that Owens had prior to FMLA leave, rather than the approximately forty-hour workweek that Owens used after DSG approved his reduced work schedule, is the proper basis for calculating Owens's FMLA leave entitlement.

DSG also argues that Owens cannot succeed on his FMLA interference claim because it did not prohibit Owens from taking FMLA prior to his exhaustion of 480 hours of leave. But it is undisputed that DSG barred Owens from using FMLA leave from January to March 2022. Although DSG may have been acting on its honest belief that Owens no longer qualified for FMLA leave, "[a]n employee need only show that his employer deprived him of an FMLA entitlement; no finding of ill intent is required." *Hickey v. Protective Life Corp.*, 988 F.3d 380, 387 (7th Cir. 2021). To prevail on his FMLA interreference claim, Owens need only establish that DSG denied him leave that he was entitled to under the FMLA. Given that DSG incorrectly calculated Owens's total

available FMLA leave, a reasonable jury could conclude that Owens was entitled to take more than 480 hours of leave under the FMLA and that DSG interfered with his rights under the FMLA by denying his requests for leave based on its improper calculation. *Culver v. Metro. Sch. Dist. of Martinsville*, No. 1:20-CV-02838-JPH-DLP, 2022 WL 4483927, at *7 (S.D. Ind. Sept. 27, 2022) (denying summary judgment for employer that denied employee's FMLA leave request due to potentially mistaken belief that employee had exhausted FMLA leave entitlement).

**B.    Prejudice**

To succeed on an FMLA interference claim, a plaintiff must demonstrate that he was prejudiced by the defendant's interference with his FMLA rights. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). In determining if a plaintiff has established prejudice, "[c]ourts look to whether the plaintiff made decisions based on their employer's interference with their FMLA rights." *Zedov v. Mr. Bult's Inc.*, 612 F. Supp. 3d 812, 817 (N.D. Ill. 2020). Prejudice can be established if "an employee would have structured his leave differently had the employer properly designated the requested leave as being taken under the FMLA." *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 368 (7th Cir. 2020).

Owens argues that he was prejudiced by DSG's incorrect calculation of his FMLA allotment because "he was not able to take his medical leave as necessary and had to choose between continue working or using PTO when he needed to address his medical condition." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 4. After Skinner told Owens that he was no longer eligible for FMLA leave, Owens repeatedly inquired about FMLA benefits and expressed his desire to use FMLA leave. On February 26, 2022,

18

Owens e-mailed Skinner asking when his FMLA leave would be replenished and if he should submit additional paperwork.  Pl.'s L.R. 56.1 Stmt., Ex. 12.  Skinner responded that Owens would not be able to use FMLA leave until April.  *Id.*  Owens testified that after DSG informed him that he had exhausted his FMLA benefits, he began using PTO for health-related absences.  Owens Dep. at 158:8-16; 218:2-12.  Owens also asserts that because he was under the impression that he was no longer able to use FMLA leave, he worked for more than forty hours per week in violation of the reduced work schedule certified by his doctor.  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 5; Owens Dep. at 233:1-8.  Additionally, when Owens attempted to notify his supervisors that his new schedule did not comport with his medically necessary reduced work schedule, Skinner told Owens's supervisors that this reduced work schedule no longer qualified because Owens had exhausted his FMLA leave allotment.  Pl.'s L.R 56.1 Stmt. ¶ 11; Pl.'s L.R. 56.1 Stmt., Ex. 14 at DSG 000228.

Given the evidence in the record that Owens would have exercised his FMLA rights differently if he had known that he could be entitled to additional leave, there is a genuine factual dispute regarding whether he was prejudiced by DSG's improper FMLA calculations and Skinner's statements about his FMLA eligibility.  *See Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 323 (3d Cir. 2014) (denying summary judgment due to dispute over whether plaintiff would have structured her leave differently if she had been properly informed of her FMLA rights); *Hannah P. v. Coats*, 916 F.3d 327, 346 (4th Cir. 2019) ("Appellee's failure to provide notice of the availability of FMLA leave prejudiced [plaintiff] because if she had been aware of the availability of FMLA leave, she could have structured her leave differently.").  DSG contends that during his

deposition, Owens conceded that he bore sole responsibility for his leave structure and work schedule following Skinner's notification that Owens had exhausted his FMLA leave. Def.'s L.R. 56.1 Stmt. at 7 n.3. But DSG mischaracterizes Owens's testimony. During Owens's deposition, DSG's counsel stated, "you're the only one to blame for you working more than 40 hours, right?", and Owens replied, "[u]m, I would have to disagree with you." Owens Dep. at 233:9-13. In response, DSG's counsel noted that Owens had the "right and responsibility" to assert his intent to use FMLA leave and stated, "you could be as mean about it as you want, because that's your protected -- federally protected right, right?", to which Owens replied, "[i]t -- it should be. You're -- you're correct." *Id.* at 233:20-234:5. Owens's agreement that he *should* have been able to assert his FMLA rights to utilize his reduced work schedule does not absolve DSG from liability for its claimed interference with his attempts to obtain FMLA leave to comply with that schedule.

In sum, DSG is not entitled to summary judgement on Owens's FMLA interference claim.

### 3. FMLA retaliation

The FMLA prohibits an employer from retaliating against an employee who assert rights under the statute. 29 U.S.C. § 2615. To succeed on a retaliation claim under the FMLA, the plaintiff must show that "(1) he engaged in FMLA-protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the two." *Juday v. FCA US LLC*, 57 F.4th 591, 596 (7th Cir. 2023). Although the plaintiff's exercise of FMLA leave need not be the sole reason for the employer's retaliatory action, the plaintiff must establish that his FMLA leave was

a "substantial or motivating factor."  *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1307 (7th Cir. 2022).

Owens claims that DSG terminated his employment in retaliation for taking protected leave on April 1, 2022 and April 2, 2022.  DSG admits that Owens's April 1, 2022, absence from work was used for FMLA leave.  Def.'s L.R. 56.1 Stmt. ¶ 39.  But Owens has not adduced evidence that he received approval to take FMLA leave on April 2, 2022.  Owens asserts that he "left work early . . . in order to be in compliance with his medically necessary FMLA reduced leave schedule."  Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶ 20.  Owens suggests that because he had a medical authorization for a reduced work schedule, he was excused from following DSG's attendance and notification policies.  *See* Pl.'s L.R. 56.1 Stmt. ¶ 6 ("Mr. Owens is not responsible for staying until the end of the shift if FMLA applies.").

But the FMLA provides that even if an employee has received authorization to take leave under the FMLA, "the employee must comply with the employer's 'usual and customary notice and procedural requirements for requesting leave.'"  *Lutes*, 950 F.3d at 365 (quoting 29 CFR § 825.303(c)).  After Owens received his initial approval for FMLA leave in March 2021, Angela Mimes, DSG's benefits and leave administrator, informed him that he would be "required to make proper notice as outlined in the company handbook under the attendance policy to HR and [his] supervisor" in order to take FMLA leave.  Def.'s Resp. to Pl.'s L.R. 56.1 Stmt., Ex. SJ-AA at DSG 000659.  By leaving work before his shift ended on April 2, 2022 without notifying his supervisor, Owens failed to give DSG proper notice regarding his intention to take FMLA leave.  Owens cites no legal authority in support of the proposition that an initial FMLA

authorization entitles an employee to circumvent his employer's internal notice procedures to take leave. *See Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 971 (7th Cir. 2000) ("Nothing in the FMLA or the implementing regulations prevents an employer from enforcing a rule requiring employees on FMLA leave to keep the employer informed about the employee's plans."). Because Owens was not engaging in protected FMLA activity when he left work early on April 2, 2022, his absence from work on that day cannot serve as the basis for an FMLA retaliation claim. *See Smith v. Hope Sch.*, 560 F.3d 694, 702 (7th Cir. 2009) (noting that plaintiff cannot succeed on FMLA retaliation claim if request for leave was invalid).

Turning to Owens's use of FMLA leave on April 1, 2022, Owens argues that he suffered an adverse action because Bachman met with DC supervisors on that day to discuss expectations for a visit from DSG executive leadership. Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6; Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 15. Owens asserts that Bachman failed to communicate the information provided at the meeting or inform him of the tasks that were delegated to him. Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6. The Court cannot determine from Owens's response brief whether his argument is that the meeting itself is an adverse action because his exercise of FMLA leave precluded his attendance, or that his absence from the meeting impacted his job performance in a way that served as the basis for other retaliatory actions. In any event, Owens has not adduced evidence from which a reasonable jury could find that the April 1 meeting or Bachman's post-meeting conduct constituted an adverse action.

For an action to be materially adverse, a plaintiff must show that "reasonable individuals would be dissuaded from exercising their statutory rights due to the

22

employer's actions." *Freelain v. Village of Oak Park*, 888 F.3d 895, 906 (7th Cir. 2018).

Owens's FMLA leave "caused" him to miss the content of the meeting to the extent that

if he hadn't taken FMLA leave, he presumably would have been able to attend. But

Owens has not provided evidence that Bachman or any other DSG employee was

motivated to schedule the meeting on that day or failed to relay the content of the

meeting due to Owens's exercise of FMLA leave. Owens testified that Bachman never

voiced disapproval of Owens's FMLA leave use. Owens Dep. at 69:14-21. And

although Owens may disapprove of Bachman's delegation of tasks during and after the

meeting, "federal courts do not second-guess personnel decisions that lie within the

reasonable discretion of employers." *Freelain*, 888 F.3d at 903. The Court concludes

that no reasonable jury could find that the circumstances surrounding the April 1 DC

supervisor meeting rose to the level of a materially adverse action or were causally

connected to Owens's FMLA leave.

Owens also contends that he suffered an adverse action because when he

returned to work on April 7, Bachman and Meil presented him with a corrective action.

Owens states that he was written up "for leaving his position early . . . and for not

completing the task allegedly delegated to him on April 1, 2022." Pl.'s Resp. to Def.'s

Mot. for Summ. J. at 6. Owens asserts that "[t]he corrective action would not have

occurred *but for* Mr. Owens using his FMLA leave." *Id.* at 7. But the evidence in the

record demonstrates that Owens's corrective action was issued because of his conduct

on April 2, not April 1. In the "description of problem/incident" section of the corrective

action, it states that the disciplinary action arose because on April 2, 2022, Owens "left

[his] scheduled work shift 5 hours early without management authorization as well as

abandoned [his] staff that was still working on their assigned project."  Def.'s L.R. 56.1 Stmt., Ex. SJ-0 at DSG 000065.  Owens has not adduced evidence from which a reasonable jury could conclude that this corrective action is casually connected to his exercise of FMLA leave on April 1, 2022.

Owens cites *Wayland v. OSF Healthcare System*, 94 F.4th 654 (7th Cir. 2024), to support his FMLA retaliation claim,[3] but that case is distinguishable.  In *Wayland*, the plaintiff's employer instituted a series of accelerated deadlines and goals for staff following a significant expansion.  *Id.* at 656.  After the plaintiff began FMLA leave, she struggled to manage the increased workload that she had been assigned prior to taking leave.  *Id.*  The plaintiff was later put on a "performance improvement plan" due to her inability to meet the accelerated deadlines, and was eventually fired from her position. *Id.* at 657.  The Seventh Circuit reversed the district court's grant of summary judgment after concluding that a reasonable jury could find that the plaintiff's employer retaliated against her by "holding her to standards that were at least as demanding as when she worked full time, and then firing her for falling short."  *Id.* at 658.

Owens's reliance on *Wayland* is misplaced.  Owens did not mention his termination in the FMLA retaliation section of his response brief and identified only the April 1 meeting and the April 7 corrective action as potential adverse actions.  Pl.'s

---

[3] Owens also cites to *Wayland* to support the proposition that "a dispute about the amount of FMLA time taken is material as it could impact how a reasonable jury interprets the employer's expectations in light of the amount of leave taken."  Mot. to Submit Suppl. Authority at 1.  But Owens does not dispute DSG's list of the days that he took full FMLA leave or its assertion that he used 480 hours of FMLA leave.  Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶¶ 39, 42.  The amount of FMLA leave that Owens took is undisputed in this case, and discussion in *Wayland* about whether there was a dispute about the amount of approved leave the plaintiff took is therefore inapposite.

Resp. to Def.'s Mot. for Summ. J. at 6-7.  And in his complaint, Owens contends that DSG retaliated against him by "terminating Plaintiff prior to him being able to submit his FMLA certification by April 15, 2022."  Compl. ¶ 71.  At no point in his complaint or in his briefing does Owens contend that he was terminated due to DSG "appl[ying] full-time standards to justify firing a leave-taking employee."  *Wayland*, 94 F.4th at 658. Although Owens's April 7 corrective action resulted from a leave of absence that he attributes to FMLA leave, DSG's application of its general leave notification policy to FMLA leave takers does not constitute a violation of Owens's FMLA rights.  *See Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 951–52 (7th Cir. 2004) ("Conditioning the right to take FMLA leave on the employee's giving the required notice to his employer is the quid pro quo for the employer's partial surrender of control over his work force."); *Albert v. Pierce Mfg., Inc.*, No. 20-C-1512, 2022 WL 180738, at *3 (E.D. Wis. Jan. 20, 2022) ("Courts have consistently held that an employer may require additional procedures for giving notice of FMLA leave.").  Furthermore, as noted above, it was Owens's failure to obtain approval for that absence, rather than his inability to complete his shift, that caused the disciplinary action.  Owens's assertions to the contrary are insufficient to withstand summary judgment.  *Shrock v. Drug Plastics & Glass Co., Inc.*, No. 4:17-CV-53-TLS, 2022 WL 1801144, at *8 (N.D. Ind. June 2, 2022) (stating that plaintiff's subjective belief that his FMLA use led to his termination was insufficient to demonstrate causal connection).

Based on the evidence in the record, no reasonable jury could find that DSG retaliated against Owens for taking FMLA leave.  DSG is therefore entitled to summary judgment on Owens's FMLA retaliation claim.

4.    **IEPA claim**

Owens claims that he received unequal pay based on his race in violation of the

IEPA.  Federal Equal Pay Act (EPA) and IEPA claims are evaluated using the same

standards.  *Bowbin v. Bulkmatic Transp., Inc.,* No. 07 C 0260, 2007 WL 3374402, at *5

n. 2 (N.D. Ill. Nov. 13, 2007) (citing 820 ILCS 112/10(a)).  Under the EPA, an employee

raises a *prima facie* case of pay discrimination by demonstrating "a difference in pay for

'equal work on jobs the performance of which requires equal skill, effort, and

responsibility, and which are performed under similar working conditions.'"  *King v.*

*Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012) (quoting 29 U.S.C. §

206(d)(1)).  In determining whether two jobs require equal skill, effort, and responsibility,

courts "look to whether the jobs have a 'common core of tasks, i.e., whether a

significant portion of the two jobs is identical.'"  *David v. Bd. of Trs. of Cmty. Coll. Dist.*

*No. 508*, 846 F.3d 216, 230 (7th Cir. 2017) (quoting *Merillat v. Metal Spinners, Inc.*, 470

F.3d 685, 695 (7th Cir. 2006)).  This is a factual determination, *see Fallon v. State of*

*Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989), and it is determined based on "the actual

job duties performed by each employee," rather than the "job description or title."

*Merillat*, 470 F.3d at 695.  "The work need not be identical; it is sufficient if the duties are

substantially equal."  *Fallon*, 882 F.2d at 1208.  If the plaintiff establishes that the

positions share a common core of tasks, "the court must ask whether any additional

tasks make the jobs substantially different.  *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d

693, 698 (7th Cir. 2003).  Once the plaintiff establishes a *prima facie* case of

discriminatory pay, "the burden of proof shifts to the employer to prove some neutral

factor that explains the discrepancy in salary."  *Lauderdale v. Ill. Dep't of Hum. Servs.*,

876 F.3d 904, 907 (7th Cir. 2017).

It is undisputed that Owens was paid less than Michael Sikora, Robert Poyner, and Cooper McReynolds, three white men who served as DC supervisors along with Owens at DSG's Romeoville location.[4] The parties do not dispute that Owens's position and those of his alleged comparators were performed under similar working conditions. The Court therefore will consider only the required skill, effort and responsibility of the positions.

In his response brief, Owens primarily focuses on rebutting DSG's "substantial differences" argument but asserts that he and his comparators possessed a common core of tasks, including supervising employees, completing "logistical task[s]," and addressing the "needs of the distribution center as a whole." Pl.'s Resp. to Def.'s Mot. for Summ. J. at 8. Owens also points out that DC supervisors often were tasked with supporting or supervising other departments. *Id.* at 9. DSG disputes Owens's description of the DC Supervisor role but concedes that the DC Supervisors "often helped each other out in supporting their departments." Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 32. And Bachman testified that the "goal for a DC supervisor is to work as a supervisor . . . in any functionality." Pl.'s L.R. 56.1 Stmt., Ex. 4 at 19:8-23. The evidence that DC supervisors performed work outside of their departments supports Owens's argument that his position required equal skill to that of his comparators. *Ahad v. Bd. of Trs. of S. Ill. Univ.*, No. 15-CV-03308, 2021 WL 6118239, at *5 (C.D. Ill. Dec.

---

[4] In November 2021 each DC supervisor received a raise, and Owens's salary increased from $48,000 to $51,360, McReynolds's salary increased from $52,000 to $54,340, Poyner's salary increased from $52,000 to $54,340, and Sikora's salary was raised to $54,500. Def.'s L.R. 56.1 Stmt. ¶¶ 13, 51; Pl.'s L.R. 56.1 Stmt. ¶ 37.

27, 2021) (noting that evidence that doctors performed surgeries outside of their specialty areas supported plaintiff's argument that all doctors performed equal work). Furthermore, all DC supervisors shared the same job description. *See* Def.'s Resp. to Pl.'s L.R. 56.1 Stmt., Ex. SJ-M. "Job descriptions may be probative even if they are not dispositive of whether positions require equal work." *Hopkins v. Stericycle Inc.*, No. 22 C 1349, 2024 WL 1092684, at *6 (N.D. Ill. Mar. 13, 2024) (citing *Epstein v. Sec'y, U.S. Dep't of Treasury*, 739 F.2d 274, 277 n.6 (7th Cir. 1984)). Owens has adduced sufficient evidence to raise a genuine factual dispute regarding whether he and his comparators performed equal work.

DSG contends that "supervising each department required different substantive tasks." Def.'s Reply at 4. For example, DSG asserts that the department that Owens supervised, the prep/assembly department, was response for "picking, staging, opening, assembling, quality inspection, and any possible repairs of the product" as well as "organizing the outgoing furniture." Def.'s L.R. 56.1 Stmt. ¶ 52. But showing that DSG departments had different specialties is insufficient to establish that the supervisory positions were substantially different. *See Lauterbach v. Ill. State Police*, No. 12-CV-03228, 2015 WL 4555548, at *5 (C.D. Ill. July 28, 2015) ("[T]he fact that [plaintiff] and her male colleagues managed different sections with different responsibilities, as [defendant] asserts, is ultimately of no moment."). Even if each DC supervisor was responsible for managing "different operations" within their individual departments, Def.'s Reply at 4, other DC supervisors can still serve as appropriate comparators as long as the jobs were sufficiently identical. *See Melgoza v. Rush Univ. Med. Ctr.*, 499 F. Supp. 3d 552, 567 (N.D. Ill. 2020) (concluding plaintiff's colleague who supervised

28

different departments was proper comparator for plaintiff's EPA and IEPA claims).

Furthermore, DSG's description of the work of DC supervisors in its motion for summary judgment conflicts with other evidence in the record. DSG contends that "each DC Department required 'substantially different' tasks." Def.'s Mot. for Summ. J. at 23. But Owens testified that certain types of work, such as "picking," was "shared amongst the departments." Owens Dep. at 172:16-173:25. Additionally, DSG asserts that Owens's work at DSG was "entirely focused on the physical assembly, preparation, repair, and returns of DSG furniture." Def.'s Mot. for Summ. J. at 24. But Owens testified that his role as DC supervisor included multiple additional managerial tasks, including training, scheduling, managing payroll, handling disciplinary matters, and supervising the work of other employees. Owens Dep. at 169:23-170:14; 178:17-25. Bachman also testified that all DC supervisors handled identical tasks, such as making hiring and firing recommendations and issuing discipline. Bachman Dep. at 56:2-4; 57:13-20. This testimony does not align with DSG's description of the DC supervisor position as "entirely focused" on discrete substantive tasks. Viewing the facts in the light most favorable to Owens, there is a genuine factual dispute over the skills and responsibilities involved in the DC Supervisor position.

Because a genuine dispute of material fact exists regarding whether Owens performed work equal to Sikora, Poyner and McReynolds, the Court turns to DSG's asserted defense to Owens's IEPA claims. Once a plaintiff has met the initial burden of showing that the employer pays workers of different races more or less for equal work, the burden shifts to the employer to show that the wage disparity is justified. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974). The justification need not be a

"good reason," but merely a nondiscriminatory one. *Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 468 (7th Cir. 2005). The justification "must also be bona fide," meaning "the factor is used and applied in good faith." *Fallon*, 882 F.2d at 1211.

DSG contends that any pay differential between Owens and his comparators is based on experience rather than race. Prior work experience is a legitimate nondiscriminatory justification for wage differences. *Fallon*, 882 F.2d at 1212 ("Employers may prefer and reward experience, believing it makes a more valuable employee, for whatever reason."). The burden is on DSG to "prove, and not just assert," that its race-neutral justification accounts for the pay disparity. *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012). DSG contends that Owens's salary was lower than that of his comparators because his colleagues had more full-time work experience and experience working in the logistics field at the time of hire. DSG has offered the following compensation chart in support of its claims:

| Employee Info | Compensation | Full Time Working Exp. Upon Hire | Full Time Logistics Exp. | Pertinent Experience | Role(s) with DSG |
|---|---|---|---|---|---|
| Plaintiff Owens (African American); Associates Degree, Hired by Brian Bachman on December 17, 2019 | $ 51,360.00 | ~5 Years | 0 Years | Jimmy John's General Store Manager (~1 Year), Area Manager (~2 Years) | Prep/Assembly Supervisor & Shop/Returns Supervisor |
| Mike Sikora (Caucasian), hired by Jason Meil on January 31, 2022 | $ 54,500.00 | ~20 Years | ~12 Years | Knox Furniture Delivery Supervisor (5 Years), Sonic Assistant Store Manager (6 Months), McDonald's Assistant Store Manager (1 Year), United States Navy, 3rd Class Petty Officer (8 Years) | Deliveries Supervisor |
| Wesley Breska (Caucasian), Associate's Degree, Hired by Jason Meil on August 3, 2021 | $ 54,340.00 | ~17 Years | ~14 Years | Amazon Dock Associate (2 Years), Champion Logistics Shipping Analyst (~4 Years), CDN Logistics Fleet Manager (1 Year), ALG Worldwide Logistics Track and Trace Manager (3 Years) | Prep/Assembly Supervisor & Shop/Returns Supervisor |
| Cooper McReynolds (Caucasian), Obtaining Bachelor's Degree at time of hire, Hired by Jason Meil on August 2, 2021 | $ 54,340.00 | ~6 Years | ~6 Years | Michaels Companies Operations Coordinator (~6 Years) | Hub and Spoke Supervisor |
| Robert Poyner (Caucasian), hired by Jason Meil on March 15, 2021 | $ 54,340.00 | ~25 Years | 0 years | Sears Loss Prevention Manager (~4 years), Ward's Loss Prevention Manager (~1 Year), Best Buy Loss Prevention Manager (~1.5 Year), Feline's Basement Loss Prevention Manager (~.5 Year), The Sports Authority Loss Prevention Manager (~.5 Years), Sears Roebuck and Co. Asset Protection Supervisor (~1.5 Years), Carson Pirie Scott and Co. Loss Prevention Manger (~1 Year) | Inventory Control Supervisor |
| Curtis Herbert (African American), Hired by Kevin Wagenecht in 2014 | $ 62,760.00 | Information Unknown, Hired Prior to DSG Acusistion in June 2019 | 7+ Years | Information Unknown, Hired Prior to DSG Acuisition of Romeoville DC. At least 7 Years logistics work at Romeoville DC based on 2014 hiring date. | Receiving Supervisor |
| Seyeda Lloyd (African American), Bachelor's Degree, Associates Degree, Trichology Certificate; Hired by Kevin Wagenecht on August 6, 2021 | $ 54,340.00 | ~16 Years | 3 Months | U.S. Air Force, Security (~1.5 Years), Richard J. Daley College Veterans Representatiave Assistant (~.5 Year), Veterans Leadership Program Employment Counsellor (~1 Year), Illinois Dept. of Human Services Personal Assistant (~4.5 Years), Centene Corporation, Adminustrative Assistant II (~4 Years), Nordstrom Logistics Processor (3 Months), Centene Corporation Finance Specialist (~1.5 Years), Timberline Knolls Administrative Assistant (~.5 Years) | Shop/Returns Supervisor |

Def.'s L.R. 56.1 Stmt. ¶ 51.

Owens concedes that at the time he was hired, he "had no experience managing a logistics department, and no prior full-time experience in the logistics field in general." Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶ 11. But according to DSG's compensation chart, Poyner, who also had no logistics experience at the time of hire, received a higher salary than Owens. *See* Def.'s L.R. 56.1 Stmt. ¶ 51. One could attribute Poyer's higher salary to his twenty-five years of full-time work experience, but Poyner had the same

31

salary as McReynolds, who had just six years of full-time work experience. *Id.* And DSG does not explain why DC supervisors with widely varying levels of experience all received the same pay. DSG also notes that two African American DC supervisors, Curtis Herbert and Seyeda Lloyd, were paid more than some or all of Owens's comparators. But considering that Herbert's prior work experience is unknown, and Lloyd's salary is identical to McReynolds's and Poyner's despite having a vastly different amount of prior full-time or logistics-related work experience than either of those individuals, their salaries provide little support to DSG's argument that DC supervisor pay was based solely on experience. *See White v. Elkhart Cmty. Sch.*, No. 3:19-CV-64 DRL, 2024 WL 2049464, at *9 (N.D. Ind. May 7, 2024) ("[W]hether other women enjoyed greater pay in their station speaks little on this record to whether [plaintiff] failed to receive equal pay for equal work.").

Furthermore, DSG asserts that it "based pay on prior work experience" and cites to paragraph twenty-nine of its response to the Owens's statement of additional material facts. Def.'s Reply at 4 n.6. But DSG's response to paragraph twenty-nine of the cited document does not contain any information about how it set compensation for its employees or how work experience factored into its salary determinations. *See* Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 29. And although DSG asserts that Jason Meil's testimony "confirms" that the comparators were entitled to a higher salary than Owens, Def.'s Mot. for Summ. J. at 25, DSG also admits that "Meil was not ultimately responsible for setting Sikora's or McReynolds's salary." Def.'s Resp. to Pl.'s L.R. 56.1 Stmt. ¶ 31. In short, DSG points to no evidence, other than its own assertions, to support its argument that prior work experience was the sole factor upon which it based

salary rates.  This is insufficient to meet its burden at summary judgement.  *See*

*Mayden v. Superior Ambulance Serv., Inc.*, 647 F. Supp. 2d 1014, 1023 (N.D. Ind.

2009) (denying summary judgment in part because no official with pay-setting authority

testified that neutral factors accounted for comparator's higher pay).  DSG is not entitled

to summary judgement on Owens's IEPA claim.

5.    **IWPCA claim**

"The IWPCA provides employees with a cause of action against employers for

the timely and complete payment of earned wages."  *Enger v. Chicago Carriage Cab*

*Corp.*, 812 F.3d 565, 567 (7th Cir. 2016).  Wages are defined as "any compensation

owed an employee by an employer *pursuant to an employment contract or agreement*."

820 ILCS 115/2 (emphasis added); *House v. Illinois Bell Tel. Co.*, 148 F. Supp. 3d 701,

705 (N.D. Ill. 2015) ("It is thus a separate contract or agreement that forms the basis of

an IWPCA unpaid wage claim.").

Owens contends that DSG violated the IWPCA by "fail[ing] to provide Plaintiff

payment of his unused PTO subsequent to his separation of employment."  Compl. ¶

84.  But Owens identifies no employment contract or agreement that he entered into

with DSG to support his IWPCA claim.  *See Id.* ¶ 80-85.  And "[a] violation of the FLSA

or the IMWL alone, without a corresponding violation of an employment contract or

agreement . . . cannot establish a violation of the IWPCA."  *Barlett v. City of Chicago*,

No. 14 C 7225, 2015 WL 135286, at *2 (N.D. Ill. Jan. 9, 2015).  Because Owens has not

alleged that DSG violated an employment contract or agreement by failing to

compensate him for unused PTO, DSG is entitled to summary judgment on Owens's

IWPCA claim.

**Conclusion**

For the foregoing reasons, the Court grants the defendant's motion for summary judgment [dkt. no. 45] on the plaintiff's FLSA (Count 1), IMWL (Count 2), FMLA retaliation (Count 4) and IWPCA (Count 6) claims but denies the defendant's motion on the plaintiff's FMLA interference (Count 3) and IEPA (Count 5) claims. The case is set for a telephonic status hearing on June 25, 2024 at 9:15 a.m. to set a trial date and discuss the possibility of settlement. The following call-in number will be used: 650-479-3207, access code 980-394-33.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 17, 2024